

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| JENNIFER MOHR, | 3 15-CV-03010-RAL |
| Plaintiff, | |
| | OPINION AND ORDER AFFIRMING DECISION OF COMMISSIONER |
| vs | |
| CAROLYN COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant | |

Plaintiff Jennifer Mohr seeks review of the denial by the Acting Commissioner of Social Security (the Commissioner) of her claim for social security disability insurance (SSDI) under Title II of the Social Security Act (the Act), 42 U S C  § 423, and for supplemental security income (SSI) under Title XVI of the Act, 42 U S C  § 1382  Docs 1, 17, 21  The Commissioner argues for affirming the denial of benefits  Doc 18  For the reasons set forth herein, this Court affirms the Commissioner's decision

**I      Procedural History**

Mohr applied for SSI benefits and SSDI benefits in November of 2011  AR[1] 241–248 Mohr alleged a disability onset date of June 10, 2010  AR 32, 241, 283  The Social Security Administration (SSA) denied Mohr's applications on initial review and on reconsideration  AR 79–181  Mohr hired her attorney Michael J  Simpson between the time of the SSA's initial

---

[1] This Opinion and Order uses "AR" to refer to the Administrative Record, followed by citation to the relevant page number therein

denial and denial on reconsideration   AR 182–190   After the denials of reconsideration, Mohr

requested a hearing before an Administrative Law Judge (ALJ)   AR 191–199   ALJ Christel

Ambuehl conducted a video hearing on January 15, 2014, in which Mohr, her attorney Simpson,

and vocational expert William H  Weiss participated   AR 29–74   The ALJ then issued a

decision determining Mohr not to be disabled under the Act   AR 6–22   Mohr requested review,

AR 4–5, and the appeals council denied the request for review, AR 1–3   Mohr then commenced

this action seeking judicial review of the denial of her claims for SSI and SSDI   Doc  1

      Mohr presents three issues to this Court

     (a) Whether the ALJ improperly rejected the opinions of psychologist Christina
         Hartline, Ph D ?
     (b) Whether the ALJ improperly rejected Claimant's credibility?
     (c) Whether this case should be reversed and the government directed to award
         benefits?

Doc  17 at 2   Although these are three fairly discreet issues, determining whether the ALJ

properly discounted the opinion of psychologist Hartline and certain of Mohr's statements

requires a broader consideration of the ALJ's decision and the record as a whole

## II   Factual Background

### A  Mohr's Work History

      Mohr was born in June of 1966   AR 32, 241   Mohr was 43 at the time of her alleged

disability onset of June 10, 2010, and was 47 at the time of the January 2014 hearing   Mohr

completed high school and one year of college   AR 34, 284   Mohr had a strong work history

before June of 2010, including doing clerical work for the State of South Dakota, Division of

Motor Vehicles at a driver licensing location, packing and supervising the packing of birdseed at

Global Harvest Birdseed, LLC, and various other jobs prior to that including a tax preparer,

office  assistant,  and  cook    AR  21,  35–37,  249–268    Mohr's  last  documented  formal

employment was with St Mary's Healthcare Center in Pierre, where she earned $851 during a 20-day period in July of 2011, working in housecleaning, until she got pneumonia  AR 35, 249 Besides the brief employment at St Mary's Healthcare Center in July of 2011, Mohr has not worked since the disability onset date, although she has taken care of one or two young grandchildren during various times  AR 19, 60, 1177, 1186, 1202, 1240

### B  Mohr's Treatment History

Mohr's alleged disability onset date—June 10, 2010—coincides with a visit to her primary treating physician, Dr Thomas Huber  AR 501–510  On that date, Mohr saw Dr Huber for non-exertional mid-chest pain in the prior week, although she was also having some back pain  Dr Huber's notes record moderate degenerative disc changes at C5-6  AR 510  Because part of the arguments in this case center on the weight to give a psychologist's opinion concerning Mohr's mental health and its effects on her ability to work, this Court will focus on Mohr's treatment for mental health issues, although initially her SSI and SSDI applications were based more on physical—that is, non-mental health—issues  When Mohr saw Dr Huber on June 10, he already had her taking Zoloft,[2] which apparently he had started on May 14, 2010, AR 506, but Dr Huber's treatment of Mohr in 2010, 2011, and 2012 primarily was for physical issues

Dr Huber referred Mohr to Dr Bryan Wellman, a neurosurgeon in Sioux Falls  In July of 2010, Dr Wellman performed an anterior cervical discectomy and fusion on Mohr at the levels of C3-4, C4-5, and C5-6  AR 360–65  The cervical fusion surgery seemed to be a

---

[2] Zoloft is a brand name for sertraline and is used to treat depression, panic attacks, obsessive compulsive disorder, posttraumatic stress disorder, and social anxiety disorder  Sertraline is a selective serotonin reuptake inhibitor, which increases levels of serotonin in the brain

3

success, in that Mohr's primary complaints of pain to Dr Wellman after the surgery concerned her lower back, rather than her cervical spine   AR 437–40, 823–28

To attempt to remedy Mohr's low back pain, Dr Wellman performed an L5-S1 anterior lumbar interbody fusion with bullet cages, an infused bone graft, and bilateral L5-S1 pedicle screw placement on December 10, 2010   AR 419–20, 432–34   Mohr's recovery from the L5-S1 fusion surgery was not as successful as from the cervical fusion surgery   Mohr was treated for back, hip, and leg issues in 2011 and into 2012   AR 374–75, 412, 673–74, 692–98, 755–778, 779–822, 877–893, 930–33, 1147   There is nothing in the Administrative Record later than May 29, 2013 concerning Mohr's treatment for ongoing lumbar pain, although she was certainly treated through that date and reported ongoing issues with pain in her testimony to the ALJ   AR 1147, see AR 37–38   Records later than May of 2013 from Mohr's psychological and psychiatric treatment in 2013 reference those issues as well   AR 1186–87, 1221, 1235

Mohr's application for SSI and SSDI in November of 2011 and almost all of her medical records and other submissions for the subsequent 18 months focused on physical issues   For instance, the function report that Mohr completed on December 5, 2011, detailed lifting restrictions of 20 to 30 pounds, ability to sit for only one hour and stand for no more than 30 minutes, and an inability to do certain past hobbies because of physical issues   AR 292–299   In 2012, Mohr's treatment for back pain included a neurological consultation with Dr Robert Ingraham, AR 692–98, pain management consultation with Dr D R Rasmussen, AR 701–704, 765–67, 771, physical therapy, AR 882–93, a lumbar facet joint injection, AR 772–73, and a visit to another surgeon Dr Gonzalo Sanchez, AR 930–32, who did not consider her a candidate for further surgery but suggested more physical therapy

In terms of cognitive or mental health issues, Mohr, in December of 2011, disclosed that she finishes what she starts, can follow written instructions, and gets along well with authority figures, that is, Mohr's December of 2011 function report appeared not to list limitations based on psychological issues   AR 297–98   The only function report submitted by any other individual, completed by Mohr's fiance at the time, David Salathe, similarly focused on Mohr's physical issues including fibromyalgia   AR 316–23   Dr Huber appeared to be the only one during this time treating Mohr for depression, but his medical records contain only a very occasional reference to depression   AR 443–486   Dr Huber mentions Mohr being worse in July of 2012 due to her pain, medications, and financial stress   AR 798   However, as late as October of 2012, Dr Huber described her limitations as being "only due to the pain "   AR 689   Two non-treating professionals opined that Mohr's depression issues were not severe   AR 84, 114–15

The complexion of Mohr's case appeared to change in April of 2013, when Mohr was referred by Dr Huber to Capital Area Counseling for depression   AR 1081–82   On April 19, 2013, Mohr began a course of treatment with Christine Hartline, Ph D (psychologist Hartline)   Mohr presented with a depressed mood, although she was not suicidal   Mohr met the criteria for "major depressive disorder, recurrent, moderate, generalized anxiety disorder, and PTSD "   AR 1081   Psychologist Hartline recorded that the posttraumatic stress disorder and depression issues began when she was a teenager, with anxiety onset when she was in her thirties   AR 1083   Mohr sadly had been abused as a child and in a previous marriage   Psychologist Hartline

5

recorded that Dr Huber was switching Mohr from Zoloft to Cymbalta[3]   Mohr's Global Assessment of Functioning (GAF)[4] score at the time was 45   AR 1085

Mohr underwent weekly counseling with psychologist Hartline in April, May, and June Mohr's treatment covered relationship issues with her fiance, her childhood trauma, and other topics, including her pain and economic problems   In mid-June of 2013, psychologist Hartline gave Mohr chapter one of a workbook on bipolar disorder   Psychologist Hartline recorded "Although it is unclear at this point whether she meets full criteria for this disorder, the workbook contains many useful skills for affective instability in general"   AR 1179–80 Psychologist Hartline provided Mohr chapter two of the workbook in early July of 2014   AR 1183–84

On July 16, 2013, Mohr underwent a psychiatric evaluation with Dr Ulises Pesce, a psychiatrist   AR 1185   Dr Pesce detailed the April of 2013 referral from Dr Huber to Capital Area Counseling at a time when Mohr was very depressed and unhappy, and described her past personal history including the episodes of abuse   AR 1185–86   Dr Pesce recorded that Mohr takes care of her granddaughter "quite often, mostly last three months"   AR 1186   Dr Pesce detailed Mohr's physical issues, her pain medications, and her switch from the antidepressant Zoloft to Cymbalta   AR 1186   Dr Pesce's diagnosis was major depressive disorder, recurrent,

---

[3] Cymbalta is a brand name for duloxetine, which is used to treat depression and anxiety, as well as arthritis, chronic back pain, and fibromyalgia   It is a serotonin-norepinephrine reuptake inhibitor, which increases serotonin and norepinephrine in the brain
[4] GAF is a numeric scale used by mental health providers to rate the social, occupational, and psychological functioning of an individual on a scale of 1 to 100   Mohr's initial GAF score of 45 is in the "serious symptoms" range, while her later scores of 60 and 65 are in the "moderate symptoms" and "some mild symptoms" ranges respectively

relational problems, and posttraumatic stress disorder  AR 1187  Mohr's GAF score at the time was 60  AR 1187  Dr  Pesce started Mohr on Abilify [5]

When Mohr returned to see psychologist Hartline on July 19, 2013, she was "doing quite well" and "frequently joked throughout session and laughed "  AR 1192  However, the next time that Mohr saw psychologist Hartline, she was noticeably upset as her fiance had ruined the day over his worries about money  AR 1193  Mohr's moods appeared to stabilize through the weekly psychology appointments in August, although she expressed the belief that Abilify was making her more irritable  AR 1197

Dr  Pesce evaluated Mohr on August 16, 2013  AR 1199  On that date, Mohr was able to ambulate without difficulties, had a thought process that showed no disorganization, had good insight and judgment, had an intact memory for recent and remote events, and had good attention and concentration  AR 1200  Her GAF score was 60  AR 1200  Dr Pesce's diagnosis of Mohr remained the same, but he increased her dose of Abilify from five milligrams to ten milligrams daily  AR 1200  Mohr continued to visit psychologist Hartline in August and September of 2013  AR 1202–09

On September 23, 2013, Dr  Pesce again evaluated Mohr  His assessment about Mohr's abilities was the same as in August of 2013  AR 1210  Mohr had a depressed mood, but it was improved from the past, and Dr  Pesce believed that the increased dosage of Abilify had helped her  AR 1211  Mohr's GAF score was 65, and her diagnosis remained the same  AR 1211

Mohr continued to see psychologist Hartline in October of 2013  Mohr had been gaining weight and questioned whether the Abilify was the cause  AR 1208, 1213–19  Mohr talked with

[5] Abilify is the brand name for aripiprazole, which is considered an "atypical antipsychotic" drug used to treat such things as major depression, schizophrenia, bipolar disorder and obsessive compulsive disorder

psychologist Hartline about having hosted a jewelry party and dealing with relational issues with her fiance  AR 1213–19

Mohr saw Dr  Pesce again on October 22, 2013  Dr  Pesce made the same findings in terms of Mohr's cognitive abilities, but noted that she was walking with a cane at that time  AR 1221  Dr  Pesce believed Mohr's depression to be improved although still present, had the same diagnosis, and recommended no changes in her medication  AR 1221  Mohr was frustrated with this as she believed her weight gain was from Abilify  AR 1226

Mohr saw psychologist Hartline twice in November and then on December 3, 2013  AR 1224–30, 1238  On December 3, 2013, psychologist Hartline completed a medical source statement of ability to do work for the SSA  AR 1228–30  Psychologist Hartline recorded that "Jennifer has reported difficulties with decision-making, paying attention, concentrating, and memory" AR 1228  Psychologist Hartline also recorded "Jennifer struggles with irritability and verbally lashing out at others when distressed" AR 1229  Psychologist Hartline expressed the opinion that Mohr's depression and posttraumatic stress syndrome interfered with her completing tasks and work  AR 1229  Psychologist Hartline's counseling records for December 3, 2013 state

> We reviewed the packet of papers she had me complete from Social Security
> Administration regarding her ability to do work-related activities  She stated she
> was comfortable with my responses, and I told her I would send it in

AR 1238

One week prior to psychologist Hartline's submission to SSA, Dr  Pesce had again seen Mohr on November 26, 2013  Dr  Pesce recorded that Mohr ambulated without a cane, had clear, well-articulated and modulated speech, had intact thought processes, had no evidence of psychosis, delusions, or hallucinations, had good judgment and insight, had no memory deficits

8

for recent or remote events, had good attention and concentration, and had an intact fund of knowledge   AR 1236   Dr Pesce's diagnosis remained major depressive disorder, recurrent, relational problem, and posttraumatic stress disorder   AR 1236   Mohr's GAF score at the time was 65   AR 1236

In December of 2013, Dr Huber evidently stopped both the Abilify and Hydrocodone prescriptions, leaving Mohr on no psychiatric medication   AR 1244   This was of concern to Dr Pesce when seeing Mohr on December 23, 2013   AR 1244   Dr Pesce's evaluation of Mohr's abilities and psychiatric condition remained the same as in the past   AR 1245   However, Dr Pesce was concerned about Mohr's mood not being stable and was suspicious of possible bipolar disorder   Dr Pesce prescribed lithium[6] to help moderate Mohr's moods   AR 1245   Mohr's GAF score at the time was 60   AR 1245

**C   Administrative Hearing and ALJ Decision**

The ALJ conducted a hearing on January 15, 2014, at which Mohr and vocational expert Weiss testified   AR 29–74   Mohr testified that she lived in Harrold in a house with her boyfriend and had three adult children   AR 33   Mohr testified about her past work experience   AR 34–36   Mohr described constant pain as a reason she could not work, including low back and hip pain and fibromyalgia   AR 37–39   Mohr described that she had depression, posttraumatic stress disorder, and bipolar disorder,[7] and did not socialize well   AR 40   Mohr testified that she was taking lithium prescribed by Dr Pesce and seeing psychologist Hartline   AR 42   Dr Huber remained her primary treating physician   AR 43   Mohr testified to sleeping

---

[6] The element lithium is used as a mood stabilizing psychiatric medication to treat major depressive disorder and bipolar disorder

[7] No healthcare provider had diagnosed Mohr with bipolar disorder, as the discussion above indicated   However, a psychologist had given her a workbook on bipolar disorder and the final visit to Dr Pesce caused him to ponder if she might have bipolar disorder

9

during the day, and to limitations on walking, standing, and sitting, which were limitations well beyond what had appeared previous in the record  AR 47–48  Mohr testified that she had no memory of conversations once they occur, cannot remember appointments, and cannot concentrate through a full television program  AR 49–50  Mohr testified that she struggled to make decisions, did not socialize, and was too traumatized to interact with the public   AR 51–52  Mohr testified to activities of daily living, including cooking, vacuuming, sweeping and mopping floors, as well as preparing meals and caring for her cats and dog, but Mohr said that it pained her to engage in such activities  AR 54–60  When prompted by questioning from the ALJ, Mohr acknowledged playing darts weekly, hosting a jewelry party, and babysitting her granddaughter for a couple of months  AR 58–61  Mohr watched her granddaughter who was three and a half years old and watched a second granddaughter who was of a similar age during the day for some time  AR 61–62

Vocational expert Weiss testified based on hypotheticals that a person with Mohr's limitations could not do her prior relevant work  AR 66  However, Weiss proffered three jobs that a person with Mohr's limitations could perform, even with certain restrictions  AR 66–68  A person could not do those jobs, however, if they needed to lie down three to four hours during the workday, AR 68, which Mohr at one point testified that she had to do, AR 48

On February 14, 2014, the ALJ issued a decision denying Mohr's applications for SSI and SSDI  AR 9–22  In doing so, the ALJ employed the sequential five-step evaluation process in 20 C F R  §§ 404 1520(a) and 416 920(a)  Under "the familiar five-step process" to determine whether an individual is disabled, Martise v Astrue, 641 F 3d 909, 921 (8th Cir 2011), the ALJ considers whether   "(1) the claimant was employed, (2) she was severely impaired, (3) her impairment was, or was comparable to, a listed impairment, (4) she could perform past relevant

10

work, and if not, (5) whether she could perform any other kind of work " Id (quoting Halverson

v Astrue, 600 F 3d 922, 929 (8th Cir 2010)), see also 20 C F R § 416 920 (detailing the five-

step process)   At the first step, the ALJ determined that Mohr had not engaged in substantial

gainful employment since June 10, 2010   AR 11   The ALJ determined at step two that Mohr

suffered from severe impairments— cervical degenerative disc disease, degenerative disc disease

of lumbar spine, degenerative disc disease of thoracic spine, fibromyalgia, major depressive

disorder, posttraumatic stress disorder, and obesity   AR 12   At step three, the ALJ determined

that Mohr did not have an impairment or combination of impairments that met or medically

equaled a listed impairment   AR 12

Between step three and step four, the ALJ is to determine an individual's residual

functional capacity (RFC)   The ALJ did so in determining that Mohr had the RFC

> [T]o perform less than a full range of sedentary work as defined in 20 C F R
> 404 1567(a) and 416 967(a)   She can lift and/or carry 10 pounds occasionally and
> less than 10 pounds frequently, sit (with normal breaks) for 6 hours in an 8 hour
> work day, stand and/or walk (with normal breaks) for 2 hours in an 8 hour
> workday   She is limited to occasional foot controls with the right foot   She can
> occasionally climb ramps and stairs, never climb ladders/ropes/scaffolds   She can
> occasionally balance, stoop, kneel, crouch and crawl   She should not be exposed
> to unprotected heights or moving mechanical parts   From a mental standpoint, the
> claimant is able to understand, remember, and carry out simple tasks and would
> be limited to simple work related decisions   She can have occasional interaction
> with coworkers, supervisors and the public

AR 15   Based on this RFC, the ALJ determined at step four that Mohr could not perform past

relevant work   AR 20–21   In the fifth and final step, the ALJ considered Mohr's age, education,

work experience and RFC, as well as the testimony of the vocational expert, and determined that

Mohr was "capable of making a successful adjustment to other work that exists in significant

numbers in the national economy "   AR 22   The ALJ thus concluded that Mohr was "not

disabled" under applicable standards   AR 22

Mohr does not take issue with the bulk of the ALJ's findings or with the application of any part of the five-step analysis  Rather, Mohr asserts that the ALJ inappropriately discounted the opinions of Mohr's treating psychologist Hartline and Mohr's own testimony concerning her limitations  Particular portions of the ALJ's reasoning in doing so will be discussed below in analyzing Mohr's challenge to the ALJ's decision

III    **Standard of Review**

"When considering whether the ALJ properly denied social security benefits, we determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole " Collins v Astrue, 648 F 3d 869, 871 (8th Cir 2011) (quoting Lowe v Apfel, 226 F 3d 969, 971 (8th Cir 2000))  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," id  (internal citations omitted), and such errors are reviewed de novo, id  (quoting Juszczyk v Astrue, 542 F 3d 626, 633 (8th Cir 2008))

The Commissioner's decision must be "supported by substantial evidence on the record as a whole " Evans v Shalala, 21 F 3d 832, 833 (8th Cir 1994)  "Substantial evidence is more than a mere scintilla," Consol Edison Co of N Y v NLRB, 305 U S  197, 229 (1938), but "less than a preponderance," Maresh v Barnhart, 438 F 3d 897, 898 (8th Cir 2006) (quoting McKinney v Apfel, 228 F 3d 860, 863 (8th Cir 2008))  It is that which a "reasonable mind would find adequate to support the Commissioner's conclusion " Miller v Colvin, 784 F 3d 472, 477 (8th Cir  2015) (quoting Blackburn v Colvin, 761 F 3d 853, 858 (8th Cir  2014)), accord Burress v Apfel, 141 F 3d 875, 878 (8th Cir 1998), Jones v Chater, 86 F 3d 823, 826 (8th Cir  1996)  "[T]he 'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard " Burress, 141 F 3d at 878

12

"'Substantial evidence on the record as a whole'     requires a more scrutinizing analysis"
Gavin v Heckler, 811 F 2d 1195, 1199 (8th Cir 1987) (quoting Smith v Heckler, 735 F 2d 312,
315 (8th Cir 1984))

A reviewing court therefore must "consider evidence that supports the [Commissioner's]
decision along with evidence that detracts from it" Siemers v Shalala, 47 F 3d 299, 301 (8th
Cir 1995)  In doing so, the court may not make its own findings of fact, but must treat the
Commissioner's findings that are supported by substantial evidence as conclusive  42 U S C
§ 405(g), see also Benskin v Bowen, 830 F 2d 878, 882 (8th Cir 1987) (noting that reviewing
courts are "governed by the general principle that questions of fact, including the credibility of a
claimant's subjective testimony, are primarily for the [Commissioner] to decide, not the courts")
"If, after undertaking this review, [the court] determine[s] that 'it is possible to draw two
inconsistent positions from the evidence and one of those positions represents the
[Commissioner's] findings, [the court] must affirm the decision' of the [Commissioner]"
Siemers, 47 F 3d at 301 (quoting Robinson v Sullivan, 956 F 2d 836, 838 (8th Cir 1992))  The
court "may not reverse simply because [it] would have reached a different conclusion than the
ALJ or because substantial evidence supports a contrary conclusion" Miller, 784 F 3d at 477

IV   Discussion

Mohr raises three issues with the ALJ's determination  (1) the ALJ's discounting of the
opinion of psychologist Hartline, (2) the ALJ's credibility determination regarding some of
Mohr's testimony, and (3) whether the case should be reversed with a directive to award
benefits  Doc 17 at 2  These issues are addressed in turn

A  Discounting of Psychologist Hartline's Opinions

13

Mohr contends that the ALJ's decision to discount Psychologist Hartline's opinions was improper—and in particular takes issue with five aspects of the ALJ's reasoning  (1) that psychologist Hartline's opinions were "inconsistent with the Claimant's ability to go to dart league, communicate appropriately with her healthcare providers, care for her grandchildren and hold jewelry parties,"  Doc  17 at 40, AR 20, (2) that Psychologist Hartline's opinions were "inconsistent with the Claimant's GAF scores, which have consistently been 60 or 65 since she started therapy,"  Doc  17 at 40, AR 20, (3) "there is also evidence that Claimant had input into Dr  Hartline's opinion, or at least had the opportunity to express whether she was 'comfortable' with the responses,"  Doc  17 at 40, AR 20, (4) "The marked restrictions are inconsistent with the fact that 'the Claimant is very close to her mother and siblings,'"  Doc  17 at 40, AR 13, and (5) Mohr's function report from 2011 did not indicate social limitations at the time,  Doc  17 at 40

"A treating physician's opinion is generally given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence' in the record "  Teague v  Astrue, 638 F 3d 611, 615 (8th Cir  2011) (quoting 20 C F R  § 404 1527(c)(2))   However, a treating physician's opinion "does not automatically control, since the record must be evaluated as a whole "  Prosch v  Apfel, 201 F 3d 1010, 1013 (8th Cir  2000) (citation and internal marks omitted)   "An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions "  Perkins v  Astrue, 648 F 3d 892, 897–98 (8th Cir  2011) (citation omitted)   "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must

'always give good reasons' for the particular weight given to a treating physician's evaluation." Prosch, 201 F 3d at 1013 (quoting 20 C F R § 404 1527(c)(2))   When the ALJ does not give the treating physician's opinion controlling weight, the opinion is weighed considering the factors set forth in 20 C F R § 404 1527(c)   See Shontos v Barnhart, 328 F 3d 418, 426 (8th Cir 2003)   The factors under 20 C F R § 404 1527(c) include   1) the examining relationship, 2) the treatment relationship, including length of treatment, frequency of examination, and the nature and extent of the treatment relationship, 3) supportability, 4) consistency, 5) specialization, and 6) any other factors brought to the ALJ's attention tending to support or contradict the opinion

The ALJ's decision regarding Mohr's psychological condition and psychologist Hartline's opinions did not involve a complete rejection of psychologist Hartline's impressions, but was more nuanced   The ALJ correctly observed   "From a mental perspective, the claimant has major depressive disorder and posttraumatic stress disorder   The record is nearly silent as to these impairments until the claimant reported a worsening of her psychologically based symptoms in late 2012 and early 2013 "   AR 18   The ALJ then noted that Mohr had mild restrictions in her activities of daily living, as the ALJ had explained earlier in the opinion as well   AR 13, 18   The ALJ concluded that Mohr had "moderate difficulties" in social functioning   AR 13   However, the ALJ accurately stated that Mohr's "[m]ental status examinations reveal intact memory, good attention/concentration and good insight and judgment "   AR 14, see AR 1200, 1211, 1222, 1236, 1245   The ALJ noted that Mohr had a GAF as low as 45 at the start of counseling, but that GAF improved after Mohr started therapy to 60–65   AR 18, see AR 1187, 1200, 1211, 1236   The ALJ did not put undue weight on the GAF, and indeed reasoned, "although GAF scores are only one consideration, the claimant's GAF scores are not indicative of disabling psychologically based symptoms   They receive some

15

weight." AR 18   The ALJ then reasoned   "When the claimant's GAF scores are considered with her activities of daily living, they suggest a higher level of functioning than alleged by the claimant at hearing." AR 18   The ALJ referenced the state agency consultants—Dr Kevin Whittle and Dr George Erickson—who had concluded that Plaintiff could perform "a relatively full range of light work," albeit sedentary work   AR 20   The ALJ also referenced the two consulting professionals on psychological issues—Doug Soule, Ph D, and George Richards, M D—who both opined in 2012 that the psychological conditions of Mohr were non-severe   AR 20, see AR 84, 114–15   The ALJ concluded that psychologist Hartline's opinions were inconsistent with Mohr's abilities and noted, with support from the record, that "there is also evidence the claimant [Mohr] had input into Dr Hartline's opinion, or at least had the opportunity to express whether she was 'comfortable' with the responses." AR 20, see AR 1238

The ALJ did not explicitly discuss the six factors under 20 C F R  § 404 1527(c) in evaluating the weight to give psychologist Hartline's opinion   The ALJ's decision, however, reflects an understanding of the examining and treatment relationship between Mohr and psychologist Hartline, as well as psychologist Hartline's specialization   The ALJ's discussion of Mohr's psychological wellbeing and psychologist Hartline's opinions reflect a consideration of the supportability, consistency, and other factors brought to the ALJ's attention tending to support or contradict the opinion   The ALJ's determination of the weight to give psychologist Hartline's opinions is not inconsistent with 20 C F R  § 404 1527(c)

There is no inherent problem in the ALJ considering, among other things, Mohr's weekly participation in a dart league, communicating appropriately with healthcare providers, and ability to care for her grandchildren and hold a jewelry party in evaluating whether Mohr's activity levels were consistent with psychologist Hartline's December 3, 2013 opinion   See Toland v

16

Colvin, 761 F 3d 931, 936 (8th Cir 2014) (discounting treating physician's opinion based on activities), Gallus v Callahan, 117 F 3d 1061, 1064 (8th Cir 1997) (discrediting mental health work limitations suggested by medical professionals when contradicted by claimant's daily activities)

Likewise, psychologist Hartline did not place inappropriate emphasis on GAF scores Surely, GAF scores can be misleading and tend to be a subjective evaluation couched in a numeral score as if an objective measurement   See Hall v Colvin, 18 F Supp 3d 144, 153 (D R I 2014), Emerich v Colvin, 90 F Supp 3d 480, 492 (M D N C 2015)   Although GAF scores may not have a direct correlation to severity of mental health issues, they nonetheless may be considered by an ALJ and in reviewing an ALJ's determination   See Myers v Colvin, 721 F 3d 521, 525 (8th Cir 2013), Goff v Barnhart, 421 F 3d 785, 791 (8th Cir 2005)   The ALJ was cautious in using the GAF scores, and indeed noted that they are only one consideration and not indicative of disabling symptoms, but rather "receive some weight"   AR 18    The ALJ's reference to the GAF scores in this manner, alongside consideration of other relevant information on Mohr's mental wellbeing, was not in error

The ALJ's observation that psychologist Hartline gave Mohr the opportunity to express whether she was "comfortable" with psychologist Hartline's submission to SSA prior to sending it is supported by the record   AR 1238   Mohr argues that there was nothing inappropriate in psychologist Hartline doing so, and that indeed may be true   However, there likewise is nothing inappropriate in the ALJ noting that psychologist Hartline vetted her opinions with Mohr before submitting them to SSA   After all, an ALJ may find a physician's opinion less credible when it is prepared for benefit purposes, rather than in the course of treatment   Hurd v Astrue, 621 F 3d 734, 739 (8th Cir 2010)   Moreover, the ALJ did not expressly reject the opinions simply

because they were vetted with Mohr ahead of time, but for various reasons expressed in the ALJ's opinion  See AR 9–22

The next challenge Mohr makes is to the ALJ's reference that she "is very close with her mother and siblings " AR 13   This reference actually is not in the section where the ALJ was discussing why she chose not to credit to a greater extent psychologist Hartline's opinions   The record contains ample information that Mohr is close to her mother, but the reference to "siblings" is an error, as Mohr has just one surviving sibling who, during at least the relevant time, lived in Chicago   AR 1084, 1193   Regardless, the ALJ did not rely on a relationship with the sibling for discounting either psychologist Hartline's opinions or Mohr's own testimony

Finally, the absence of social limitations reflected in the 2011 function report is a fair reading of the report   AR 292–99   That report was done before Mohr's course of treatment began at Capital Area Counseling   The ALJ's decision reflects an understanding that there was a worsening of Mohr psychologically in late 2012 and early 2013   AR 18   The ALJ's analysis reflects a consideration of a wide range of information, including but not limited to the 2011 function report, in evaluating the seriousness of Mohr's psychological condition   There is nothing wrong with the ALJ's approach in that regard or generally in how the ALJ looked at a multitude of information and factors in determining what weight to accord psychologist Hartline's opinions

**B   The ALJ's Evaluation of Mohr's Credibility**

Mohr argues that the ALJ improperly discounted Mohr's own statements about her limitations   Doc 17 at 47–48   The Commissioner responds that the ALJ appropriately evaluated Mohr's credibility   Doc 18 at 13–16

When analyzing a claimant's subjective complaints of pain and limitations, an ALJ under Eighth Circuit precedent must consider the objective medical evidence, the claimant's work history, and the "Polaski factors," which include "(1) the claimant's daily activities, (2) the duration, frequency and intensity of the pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness and side effects of medications, and (5) functional restrictions." Perkins v Astrue, 648 F 3d 892, 900 (8th Cir 2011) (internal quotation marks omitted) (listing factors articulated in Polaski v Heckler, 739 F 2d 1320, 1322 (8th Cir 1984))   An ALJ need not explicitly discuss each Polaski factor, but an ALJ who rejects subjective complaints "must make an express credibility determination explaining the reasons for discrediting the complaints." Wagner v Astrue, 499 F 3d 842, 851 (8th Cir 2007) (quoting Singh v Apfel, 222 F 3d 448, 452 (8th Cir 2000))

Although an ALJ may not discount a claimant's subjective complaints solely because they are not fully supported by objective medical evidence, a claimant's complaint "may be discounted based on inconsistencies in the record as a whole." Ellis v Barnhart, 392 F 3d 988, 996 (8th Cir 2005)   A court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Perks v Astrue, 687 F 3d 1086, 1091 (8th Cir 2012) (quoting Pelkey v Barnhart, 432 F 3d 575, 578 (8th Cir 2006))   The Eighth Circuit has cautioned judges against substituting their opinions for opinions of ALJs, who are "in a better position to assess credibility." Eichelberger v Barnhart, 390 F 3d 584, 590 (8th Cir 2004)   Mohr's case appears to be one where "there is no doubt that the claimant is experiencing pain, the real issue is how severe that pain is." Gowell v Apfel, 242 F 3d 793, 796 (8th Cir 2001) (quoting Woolf v Shalala, 3 F 3d 1210, 1213 (8th Cir 1993))

The ALJ here did not reject all of what Mohr said about her physical and mental wellbeing or abilities. However, the ALJ did reject Mohr's statements concerning the intensity, persistence, and limiting effects of her symptoms. AR 16. The ALJ then discussed Mohr's medical records and reports from physicians, AR 16–17, Mohr's testimony during the hearing, AR 17, and Mohr's medications, AR 17–18. The ALJ, with support in the record, noted that "with respect to all of Claimant's physical impairments, she has had ongoing treatment, but her treatment was very limited in 2013." AR 18. The ALJ appropriately observed

> Specifically, the claimant is able to perform personal care activities without assistance, make lunch and dinner for herself and her significant other, and clean up afterward. She can perform some household chores, including laundry, vacuuming, mopping, and loading/unloading the dishwasher. She feeds and waters her cats and dog, and cleans the litterbox. She shops for groceries and other items. The claimant also cares for her young grandchildren. She claims she has not driven since 2011 because of her medications. [8] However, she has not reported that she is unable to drive to any of her treatment providers, nor have they restricted her from driving. All of these activities reflect an ability to perform at least sedentary work.

AR 18. The ALJ determined that Mohr had "mild restrictions" in activities of daily living and "moderate difficulties" in social functioning based on the information of record. AR 13. The ALJ then discussed Mohr's psychological issues, with the medical records being limited as to any psychological impairments until 2013, and situational stressors at that time. AR 18. The ALJ noted that the mental status examinations revealed intact memory, good attention/concentration, and good insight and judgment. AR 14. Indeed, the repeated evaluations in the second half of 2013 by Dr. Pesce of Mohr's abilities conflicted with and

---

[8] There is evidence in the Administrative Record that Mohr drove on her own since 2011, notwithstanding her testimony in front of the ALJ. AR 295 (indicating that she drives the car, but only when no one can give her a ride), AR 319 (third party indicating that she drives if she has to), AR 1177 (indicating that she was planning to travel to Aberdeen that day to bring her granddaughter back to see her mother).

directly undermined Mohr's testimony in January of 2014 about severe limitations based on her cognitive or mental health issues.  Compare AR 49−53, with AR 1200, 1211, 1222, 1236, 1245.

Although the ALJ did not specifically enumerate the Polaski factors, consideration of each of those five factors can be found in the ALJ's discussion analyzing Mohr's testimony and reported limitations.  "The ALJ is not required to discuss each Polaski factor as long as the analytical framework" for evaluating credibility "is recognized and considered."  Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).  The ALJ's consideration of the activities of daily living in determining whether to credit Mohr's testimony about her extreme limitations is appropriate.  See Wagner v. Astrue, 499 F.3d 842, 852–53 (8th Cir. 2007); Brown v. Barnhart, 390 F.3d 535, 541 (8th Cir. 2004).

### C.  Request for Remand for Benefits

Because this Court has determined that the Commissioner's decision ought to be affirmed, a remand with a directive to award benefits is not appropriate here.

## V.    Conclusion

For the reasons explained above, it is hereby

ORDERED that the Commissioner's decision is affirmed and that Judgment enter accordingly.

DATED this ___30th___ day of September, 2016.

BY THE COURT:


ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE